1

```
1                  UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF TEXAS
2                          TYLER DIVISION

3    UNITED STATES OF AMERICA    |  DOCKET 6:15CR40, 6:16CR41
                                 |
4                                |  FEBRUARY 21, 2017
     VS.                         |
5                                |  4:03 P.M.
                                 |
6    LAQUAYLAN W. PATTERSON      |  BEAUMONT, TEXAS

7    -----------------------------------------------------------

8              VOLUME 1 OF 1, PAGES 1 THROUGH 73

9           REPORTER'S TRANSCRIPT OF SENTENCING HEARING

10             BEFORE THE HONORABLE RON CLARK,
                 UNITED STATES DISTRICT JUDGE
11
     -----------------------------------------------------------
12

13
     APPEARANCES:
14
     FOR THE GOVERNMENT:      JAMES MACK NOBLE, IV
15                            ASSISTANT UNITED STATES ATTORNEY
                              110 NORTH COLLEGE AVE, SUITE 700
16                            TYLER, TEXAS   75702

17
     FOR THE DEFENDANT:       MICHAEL PHILIP LEVINE
18                            OMAR NAWAZ
                              NAWAZ & LEVINE
19                            325 N. ST PAUL STREET, SUITE 2100
                              DALLAS, TEXAS   75201
20

21   COURT REPORTER:          CHRISTINA L. BICKHAM, CRR, RMR
                              FEDERAL OFFICIAL REPORTER
22                            300 WILLOW, SUITE 221
                              BEAUMONT, TEXAS   77701
23

24
        PROCEEDINGS RECORDED USING COMPUTERIZED STENOTYPE;
25     TRANSCRIPT PRODUCED VIA COMPUTER-AIDED TRANSCRIPTION.
```

1                    TABLE OF CONTENTS

2                                                    PAGE

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                  (OPEN COURT, DEFENDANT PRESENT.)

2                  THE COURT:  All right.  I call Laquaylan

3    Wesley Patterson, Number 6:15cr40 and Number 6:16cr41.

4                  Is the government ready?

5                  MR. NOBLE:  Good afternoon, your Honor.  Jim

6    Noble for the United States.  We're ready to proceed.

7                  THE COURT:  And is the defendant ready?

8                  MR. LEVINE:  Good afternoon, your Honor.

9    Michael Levine for the Defendant Patterson with Omar

10   Nawaz.

11                 If I may briefly, your Honor, apologize to the

12   court.  We're mortified.  I don't know how this happened.

13   I can't apologize enough to you, the government, to all

14   of the parties and the staff.  It's about the most

15   terrible thing I've had happen in court.

16                 THE COURT:  All right.

17                 MR. LEVINE:  Sorry, your Honor.

18                 THE COURT:  All right.  But you're ready to

19   proceed now, right?

20                 MR. LEVINE:  I am ready to proceed, your

21   Honor.  Yes, sir.

22                 THE COURT:  Okay.  Then have you read the

23   revised PSI in this case -- that December 7, 2016, PSI --

24   and discussed it with your client?

25                 MR. LEVINE:  Yes, your Honor.  I believe

1  Mr. Nawaz has discussed it with Mr. Patterson.

2           THE COURT:  Okay.  This is federal court,

3  which is different than state; so, you will want to stand

4  when you speak.

5           MR. LEVINE:  I'm sorry, your Honor.  I'm used

6  to all of the cameras in Sherman.  They tell you to sit.

7  I'm sorry.  I apologize, your Honor.

8           THE COURT:  Well, all right, then, Mr. Nawaz,

9  I guess I'll have to ask you.  Did you read the

10  Presentence Investigation Report and discuss it with your

11  client?

12           MR. NAWAZ:  Your Honor, the presentence report

13  has been mailed to Mr. Patterson and received by

14  Mr. Patterson and discussed with Mr. Patterson but over

15  the phone, your Honor, only.

16           THE DEFENDANT:  Over the phone, really?

17           THE COURT:  Okay.  I guess I need to be sure

18  that an attorney has discussed -- let me ask both of you,

19  then.  Has one of you read the December 7, 2016,

20  Presentence Investigation Report and discussed it with

21  your client?

22           MR. NAWAZ:  Yes, your Honor.

23           THE COURT:  All right.  Do you believe he

24  understands it?

25           MR. NAWAZ:  Yes, your Honor.

1                    THE COURT:  All right.  Mr. Patterson, would

2    you please stand, sir.

3                    Sir, have you read the Revised Presentence

4    Investigation Report -- that's the one dated December 7,

5    2016 -- and discussed that with one or the other of your

6    attorneys?

7                    THE DEFENDANT:  I've read it, your Honor; but

8    I haven't discussed it with either one of my attorneys.

9    I haven't seen an attorney since September 8th, your

10   Honor.

11                   THE COURT:  I didn't -- say that again and

12   speak just a little slower because with the microphone,

13   it's --

14                   THE DEFENDANT:  I haven't seen a lawyer since

15   September 8th during the PSI investigation.  The guy came

16   out there and did the investigation.  Last time I talked

17   to a lawyer --

18                   THE COURT:  Okay.

19                   THE DEFENDANT:  -- was September 8th.  I've

20   got a visitation log over at the Gregg County Jail if you

21   would like to check it.  I've got telephone --

22                   THE COURT:  Okay.  You can go ahead and be

23   seated, sir.  Thank you.

24                   THE DEFENDANT:  All right.  Thank you.

25                   THE COURT:  Well, let me ask counsel, since

6

1   that's actually the first question -- or since I was --

2   that's the first question I always have to ask is -- and

3   ensure that there has been some communication between

4   counsel and the client.  Let me hear your position on it.

5              MR. NAWAZ:  Yes, your Honor.  There has been

6   communication between counsel and the client, your Honor.

7   Now, communication in my mind, judge, does not

8   necessarily mean that the client is happy, satisfied, and

9   is wanting what is being said.

10             And if I might be so bold, your Honor, during

11  the pendency of the case in the Eastern District of Texas

12  in this division, in the Tyler Division, while

13  Mr. Patterson was in Longview, I personally visited him

14  several times there.  I also had mail correspondence with

15  him there.  He has copies of a substantial, if not all,

16  of his discovery which I took to him personally and

17  mailed to him there.  I took the Plea Agreements to him

18  in Longview personally.  I personally attended the PSR.

19  I personally gave him e-mail correspondence between

20  myself, Mr. Levine, and the criminal chief in the

21  Northern District of Texas because as the government

22  prepared for trial here in Tyler -- which the court

23  graciously moved for me as I had two procedures performed

24  last summer at MD Anderson in Houston.  The government

25  came by my office in Dallas, Texas, Mr. Noble along with

1    an agent; and we discussed the case there as well.

2         They recovered DNA allegedly in a bank robbery

3    that fit a similar M.O., and they were attempting to

4    deduce that evidence at trial.  So, I gave Mr. Patterson

5    notice of that evidence that had been found and we

6    discussed his options and then from there we set about,

7    in Dallas, negotiating with the trial chief in the

8    Northern District to send a Rule 20 over here so that

9    these cases may run concurrently, or at the same time.

10        So, to answer your question, judge, I don't

11   mean to be coy with the court at all, your Honor, because

12   you deserve a direct answer; and Mr. Patterson does as

13   well.  But communication with Mr. Patterson has been

14   made.  And I think what Mr. Patterson is referring to, if

15   I might address it, your Honor, is that he had asked for

16   a meeting with Mr. Noble after we had signed the Plea

17   Agreements, after the pleas had been accepted by the

18   magistrate; and ostensibly the meeting with Mr. Noble was

19   to discuss some sort of collaboration or cooperation.

20        In the interim, your Honor -- I know you see a

21   lot of people.  But I appeared here before on a different

22   individual and was given a very good example by which the

23   court and the government here in Tyler measures

24   cooperation or collaboration and what is going to qualify

25   for some sort of reduction, what's going to at least fit

1  the minimal requirements for the committee that the

2  prosecutor here uses in order to file a motion to reduce

3  time based on substantial assistance.

4          Not having any information on my client's

5  behalf that rose to the level of an arrest or

6  prosecution, I unilaterally decided not to set a meeting

7  between Mr. Patterson and Mr. Noble because I did not

8  believe we had any sort of information that would lead to

9  an arrest or prosecution; and I certainly didn't have any

10 information that would have led to a motion for a 5K1 in

11 this scenario, your Honor.  So --

12         MR. LEVINE:  Your Honor, may I add one thing

13 to clarify in regards to the PSRs?  They are identical.

14 The initial disclosed PSR and the revised are verbatim

15 with the exception, I believe, of the manner in which

16 they set forth the special conditions.  But as far as

17 substantively there are no alterations, your Honor; and

18 there were no objections by either party in the interim

19 between the original disclosure and the amended.  Thank

20 you.

21         THE COURT:  Okay.  Then given that, did

22 somebody discuss with Mr. Patterson the initial one?  I'm

23 trying to get out that somebody has.  I mean, you say

24 he's gotten copies of it.  Did someone discuss it with

25 him?

1          THE DEFENDANT:  No.  No, sir.

2          THE COURT:  Wait, wait.

3          THE DEFENDANT:  No, sir.

4          THE COURT:  I want to hear from counsel.  I

5    mean --

6          THE DEFENDANT:  All right.

7          THE COURT:  -- did someone discuss either --

8          MR. NAWAZ:  Yes, your Honor.  In a word, yes,

9    your Honor.

10         THE COURT:  Okay.  By phone?  I mean, how did

11   that happen?

12         MR. NAWAZ:  Yes.  Yes, your Honor, by phone.

13         THE COURT:  Okay.  To the facility where he

14   was being held?

15         MR. NAWAZ:  To a phone call that he had made

16   collect to my office, your Honor, and also to a phone

17   call he had made to my phone where I had opened the

18   account that allowed calls to be made, so at

19   (214)741-6500 and (214)641-1740, your Honor.

20         THE COURT:  And, Mr. Levine, you brought up

21   the October report.  Had you had some discussion with

22   Mr. Patterson about it, or how did that strike your eye

23   on that one?

24         MR. LEVINE:  Your Honor, I have not discussed

25   either PSR with him.  I've looked at both PSRs.  Omar and

1  I are partners and have been for 13 years or 14 years,

2  and I was assisting him on this case.  I was assisting

3  him in the negotiations with the government in the

4  Eastern District and the Northern District; and when he

5  was having surgery, I appeared for him so that we could

6  accomplish the plea, your Honor.

7              THE COURT:  All right.

8              MR. LEVINE:  But I have reviewed both PSRs,

9  and I have met Mr. Patterson before.  I cannot tell the

10 court that I have ever discussed the PSRs with him,

11 though, given my knowledge that I know Omar would

12             THE COURT:  Okay.

13             MR. LEVINE:  We've handled dozens and dozens

14 of cases.  It would just be our practice; and he told me

15 he did, your Honor.

16             THE COURT:  All right.  Now, Mr. Patterson --

17 and please stand, sir.

18             I hear you're saying that they didn't meet

19 with you, but Mr. Nawaz just said that he discussed the

20 report with you over the phone.

21             THE DEFENDANT:  Over the phone.

22             THE COURT:  Okay.

23             THE DEFENDANT:  That means it should have been

24 recorded, right?

25             THE COURT:  I'm sorry?

1        THE DEFENDANT:  That means there should be a

2    recording, right?  When I call out, it says that every

3    phone call made is being recorded; so, there should be a

4    recording.

5        THE COURT:  Well, it may or may not be.  I

6    don't know that for sure.

7        THE DEFENDANT:  Well, it says it every time I

8    make a phone call out, sir.

9        THE COURT:  Okay.  That's a statement -- or a

10   question to me, but I'm asking you a question.  Are you

11   saying that they did not talk with you on the phone?

12       THE DEFENDANT:  No, sir.  I haven't seen a

13   judge -- I haven't seen him since September 8 when they

14   came and did my PSI, your Honor.

15       THE COURT:  Okay.  But that's not my question.

16   My question is:  Are you saying he did not talk with you

17   on the phone?

18       THE DEFENDANT:  No, he did not, sir.

19       There should be a recording.  I mean, there

20   should be a recording.  I mean, he should be able to pull

21   it up if it was.

22       Matter of fact, I mean, that's how Mr. Noble

23   got the phone records saying that a unknown phone was

24   mine.  He went to Gregg County and pulled up records and

25   listened to phone calls and all that.  I mean, why

1    shouldn't it be able to be seen right now?  I mean, you

2    know what I'm saying?  That's how he was able to say that

3    a cell phone was mine that was not even in my name.  He

4    went about pulling those phone numbers that was in that

5    cell phone and knowing that I was calling from Gregg

6    County and -- (indiscernible) -- am I right or wrong?

7              Am I right or wrong?

8              THE COURT:  Okay.  Mr. Patterson, again,

9    you're not asking questions here.

10             THE DEFENDANT:  Yes --

11             THE COURT:  Okay?

12             THE DEFENDANT:  Yes, sir.  Yes, sir.  I'm not

13   trying to --

14             THE COURT:  Sir, wait.

15             THE DEFENDANT:  -- but I'm --

16             THE COURT:  Hold on just --

17             THE DEFENDANT:  -- just --

18             THE COURT:  -- one second, sir.  Just hold on.

19             THE DEFENDANT:  Yes, sir.  Yes, sir.

20             THE COURT:  Well, it becomes a little more

21   difficult because Mr. Levine was late.  But what I'm

22   going to order right now is -- you're all together in one

23   spot.  Counsel, I want you to discuss this PSR with him;

24   and if he has any questions -- or his PSI.  And if he has

25   any questions about it, go over it with him.  I'm going

1  to give you 30 minutes to go do that, and then we're

2  going to go ahead and have this sentencing hearing.

3          Now, this may wind up making the sentencing

4  hearing run a little bit past 5:00; and, so, I'm going to

5  ask the clerk to contact the CSOs or whoever is needed to

6  be sure that the courtroom can be open and secure.  But

7  there doesn't seem to be any point in dragging this on

8  many more days.

9          So, at this point we're going to take a

10  recess.  Counsel, what I'm going to ask is for the U.S.

11  Attorney and the government (sic) to step outside so

12  there is a way that they can talk privately with their

13  client.  Obviously the deputy is going to have to remain

14  in place for security reasons, and obviously we're going

15  to go ahead and mute.

16          Did you have a question, Mr. Patterson?

17          THE DEFENDANT:  Yes.  I would like to ask

18  why -- was there a fine that I have to pay in order for

19  me to come to court?

20          THE COURT:  I'm sorry.  A fine that you had to

21  pay to come to court?

22          THE DEFENDANT:  Yes.  I was told I had to pay

23  a thousand-dollar fine before I was able to come to court

24  that was ordered by a judge.  That's why the January 24th

25  date was canceled.

1          THE COURT:  I know nothing about a fine that

2   you had to pay to come to court unless you've got some

3   kind of state charge.

4          THE DEFENDANT:  Well, that's what I was told.

5   That's why my court date was canceled January 24th.  They

6   told my people I had to pay a thousand-dollar fine in

7   order to come to court or I would be sitting in Gregg

8   County Jail until it's paid.

9          THE COURT:  Well, I don't know who told you

10  that.

11         THE DEFENDANT:  Am I right?

12         I mean, that's what they told my people, and

13  my people had to pay a thousand dollars.  That's why

14  we're here today.  That was why the court was canceled

15  January 24th.

16         THE COURT:  Okay.  I have no idea why somebody

17  would have told anybody that you have to pay a thousand

18  dollars to come to a federal court.  I do not know what

19  that is about, but right now what I'm telling you is both

20  your lawyers are there and I'm directing you and them to

21  go ahead and discuss this report.  You have a copy of it.

22  If you've got questions about it, talk to them.

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  We're in recess.

25         (Recess, 4:19 p.m. to 4:48 p.m.)

2-24-2016, Sentencing Hearing

15

1          (Open court, defendant present.)

2          THE COURT:  All right.  We're back on the

3  record in the *United States versus Patterson* case.  I see

4  that counsel are all there along with Mr. Patterson.

5  I'll note for the record that I have the Waiver of Rights

6  and Consent to Proceed by Video here.

7          And let me ask Mr. Noble:  Are you having any

8  problem at that end hearing me or understanding me on

9  this audio/video hookup?

10          MR. NOBLE:  No, sir, your Honor.

11          THE COURT:  All right.  Mr. Levine, same -- I

12  mean, you're only a few feet apart but just to be sure.

13          MR. LEVINE:  No, your Honor.  Thank you.

14          THE COURT:  Okay.  All right.  I do not see in

15  the file any objections from the government.  Is that

16  correct?

17          MR. NOBLE:  We have no objection to the

18  presentence report, your Honor.

19          THE COURT:  All right.  And I do not see any

20  objections filed on behalf of defendant.  Is that

21  correct?

22          MR. LEVINE:  That is correct, your Honor.  No

23  objections were filed on Mr. Patterson's behalf.

24          THE COURT:  All right.  And I will note for

25  the record there is -- let me just ask counsel.  I mean,

1  we've had another 30 minutes where we took the recess.

2  We're back on the record now.  Did you have an

3  opportunity, either counsel -- I mean, Mr. Nawaz said

4  he'd talked to him on the phone.  Both of you have been

5  there now.  Did you have an opportunity to answer

6  questions that Mr. Patterson had?

7            MR. LEVINE:  I apologize, your Honor.

8  Your Honor, I have -- or we have to the best of our

9  ability.  We are in fundamental disagreement as to the

10  character of the evidence, is what this comes down to.

11            In terms of the proceedings today, though, I

12  have asked Mr. Patterson if he's understood the

13  application of the guidelines to the facts, regardless of

14  whether he agrees to them.  He can certainly answer this

15  for himself.

16            I don't believe there are any true objections

17  in terms of anything substantive to the guideline

18  applications, your Honor.

19            THE COURT:  All right.  Well, Mr. Patterson,

20  if you'd please stand, sir.

21            Now, I understand you may not agree with the

22  probation officer, i.e., how the scoring should be done,

23  or you may not agree with the probation officer's

24  recommendation as to what the sentence should be or what

25  the guideline range -- I mean, what the sentence should

1  be.  But let me ask first are there any mistakes as far

2  as the evidence about your personal background, i.e.,

3  there is a statement in there that you're married to one

4  person and you're not or it says you never went to school

5  and you did.  I mean, are there any -- let's start off

6  with your background questions there.  Anything that you

7  think is in error on the background in that report?

8             THE DEFENDANT:  No, sir.

9             THE COURT:  What?

10            THE DEFENDANT:  Nothing.  No, sir.

11            THE COURT:  There's not?  Okay.

12            All right.  And then as to the facts of the

13  case itself -- and here I'm looking at the sections where

14  it's talking about what the offense is, and that's

15  basically what was set out in the Factual Basis that was

16  done earlier.  Do you think there are errors there?

17            THE DEFENDANT:  May I ask you what pages

18  you're looking at, your Honor?

19            THE COURT:  Well, the pages that are talked

20  about in your PSI that starts off on page 4 where it says

21  "The Offense," where it's talking about this particular

22  case.  My question is:  Are there errors you think there?

23  For example, it says -- oh, I don't know -- you held up a

24  grocery store that you didn't hold up or something like

25  that.  In other words, they have an extra paragraph in

1    there that was not in your Factual Basis in terms of what

2    you did.

3            THE DEFENDANT:  I think so.

4            THE COURT:  I'm sorry?

5            THE DEFENDANT:  I think so.

6            THE COURT:  All right.  Tell me what that is.

7            THE DEFENDANT:  All right.  Basically what I'm

8    getting at is they still don't have the suspect

9    positively identified.  They don't have nobody to stand

10   on the -- to even take the stand and say yes, it was one

11   of these.  They don't have no proof of me even being with

12   her physically.  I got proof that she lied several times

13   throughout her debrief --

14           THE COURT:  Hold up.  Hold up.  Hold up.  You

15   say "she."  What "she" are you talking about?

16           THE DEFENDANT:  Ms. Chanel Collins, the

17   codefendant in the case.

18           THE COURT:  Okay.  All right.  That --

19           THE DEFENDANT:  I have her -- I have her

20   debrief here where we can point out several lies that she

21   made on her debrief.  I mean, this is through they

22   investigation, not nothing I researched.  This is what

23   they presented in my discovery.

24           THE COURT:  Okay.

25           THE DEFENDANT:  Do you understand?

```
 1              MR. LEVINE:  Your Honor, I'm sorry to
 2   interrupt --
 3              THE COURT:  Wait, wait, wait.
 4              THE DEFENDANT:  And from what I'm seeing --
 5              THE COURT:  Hold on, sir.
 6              THE DEFENDANT:  -- the only evidence --
 7              THE COURT:  Sir, hold on one second.  Let me
 8   get a paper here.  I'm looking for a particular document
 9   here.
10              THE DEFENDANT:  Yes, sir.
11              (Off-the-record discussion between the
12   defendant and Mr. Levine.)
13              THE COURT:  Okay.  So, what you're saying
14   basically is the information in Paragraph 18, which is
15   the paragraph that's on page 7 that talks about this
16   Ms. Patterson (sic) saying she had known you and saw you
17   and so on and so forth, you're saying that that's not
18   correct.
19              THE DEFENDANT:  There's two cases.  I'm trying
20   to figure out which one you're talking about, your Honor.
21              THE COURT:  Well, you're the one that's
22   saying -- the one place I --
23              MR. NAWAZ:  Page 6?
24              THE COURT:  Wait.  Wait.  The one place in
25   this report that I have seen where there is discussion
```

1 about what Ms. Patterson (sic) said is on page 7 of the

2 report, at Paragraph 18.  I don't see anywhere else where

3 it talks about her.

4          THE DEFENDANT:  That's the second case, your

5 Honor.  That's a different case.  That's the case out of

6 the Northern District.

7          THE COURT:  Okay.  But I'm looking now at the

8 Presentence Investigation Report.  That's what I'm asking

9 you about because that's what I'm --

10          THE DEFENDANT:  That's what I'm looking --

11          THE COURT:  -- looking at.

12          THE DEFENDANT:  That's what I'm looking at,

13 too, your Honor.

14          THE COURT:  If there is another page where

15 they are talking about Ms. Patterson (sic), point it out

16 to me.

17          THE DEFENDANT:  There is no Ms. Patterson,

18 your Honor.  The only Patterson is me, your Honor.

19          THE COURT:  I'm sorry.

20          THE DEFENDANT:  There is no Ms. Patterson.

21          THE COURT:  Ms. --

22          THE DEFENDANT:  That's me.

23          THE COURT:  I'm sorry.

24          THE DEFENDANT:  My name is Laquaylan

25 Patterson.

1          THE COURT:  Lorenza Davis.

2          THE DEFENDANT:  That's a different case, your

3    Honor.

4          THE COURT:  Okay.

5          THE DEFENDANT:  That's something else.

6          THE COURT:  Who is the lady -- where is the

7    information in this report that you think is not

8    accurate?

9          THE DEFENDANT:  My lawyer said Paragraph 24

10   and 25 on page 8.  I mean, the second case starts on

11   page 7, Number 20 -- Paragraph 20 where the Eastern

12   District case is.  Page 7, Paragraph 20 is where it

13   starts, your Honor.

14         THE COURT:  Okay.  And you're talking about

15   some debriefing with your codefendant.  Paragraph 20

16   doesn't seem to talk about your codefendant.

17         THE DEFENDANT:  No.  I'm saying that's where

18   the case starts, page -- chapter -- I mean, Paragraphs 24

19   and 25 on page 8, your Honor.

20         THE COURT:  Okay.  Where they're talking about

21   this Chanel Collins?  Is that the lady you're talking

22   about?

23         THE DEFENDANT:  Yes, sir.

24         THE COURT:  All right.

25         THE DEFENDANT:  From the beginning, your

1    Honor, she's been saying she was kidnapped, from the
2    jump.  She came to the Eastern District and said --
3    matter of fact, she even made phone calls.  I have all
4    the paperwork you need, but this is what they placed in
5    my discovery.  She been saying she was kidnapped from the
6    jump, your Honor.  Here today I have her debrief where I
7    can point out several lies which are to the District
8    Attorney.
9              THE COURT:  All right.
10             THE DEFENDANT:  I would --
11             THE COURT:  Hold up.  Let me just ask you
12    questions, sir.
13             THE DEFENDANT:  Yes, sir.
14             THE COURT:  So, you're saying that where she
15    is reporting that she was kidnapped in Paragraph 25,
16    that's wrong.
17             THE DEFENDANT:  Yes.
18             THE COURT:  Okay.  And --
19             THE DEFENDANT:  She said she was kidnapped.
20    She also said that I was her accomplice during the bank
21    robbery.
22             Basically what I'm saying is the only -- they
23    been saying it's only been two people that committed this
24    crime, your Honor.  There's the actual suspect and this
25    female who has been identified by witnesses, only two

```
 1   people.

 2              THE COURT:  All right.

 3              THE DEFENDANT:  So, the only information --

 4   what I'm saying is the only information you even have is

 5   what she provided, is what she provided, due to the fact

 6   I'm saying I'm not the suspect.  I didn't tell them

 7   anything.  They don't have any written statements that I

 8   made.  They don't have any verbatim record of me giving

 9   evidence of what happened.  None of that.

10              So, all they evidence is based off what she

11   said.  Basically I'm saying she's been lying from the

12   beginning to the end of this case; so, how can you get to

13   where she is telling the truth?

14              THE COURT:  All right.  Any other -- any other

15   paragraphs that you say are in error in this PSI?

16              THE DEFENDANT:  Yes.  Paragraph 26, your

17   Honor.

18              THE COURT:  All right.

19              THE DEFENDANT:  The DNA basically was -- was

20   basically saying -- solving that case.

21              Well, here I have the CSI reports of whoever

22   investigated the car -- I mean, who took -- who examined

23   the swabs, car.

24              Now, one time what they -- what they said they

25   got my DNA on was found on a swab from the driver's side
```

1    door auto window switch, but here in the reports you can

2    see they not saying anything about a window or a window

3    switch in their reports.  So, how did the FBI collect the

4    swab when it's not even mentioned in the CSI reports?

5    I'm not understanding that.

6              THE COURT:  All right.  What else do you --

7              THE DEFENDANT:  I have --

8              THE COURT:  Okay.  What other paragraph do you

9    say is wrong?

10             THE DEFENDANT:  That should be it.  I mean,

11   that --

12             THE COURT:  All right.  Sir, I just want you

13   to list for me the --

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  -- paragraphs.  You've given me

16   24, 25, and 26.

17             THE DEFENDANT:  Yes, sir.

18             THE COURT:  Okay.  You disagree with the

19   probation officer's report in those paragraphs.

20             THE DEFENDANT:  Yes, sir.

21             THE COURT:  Are there other paragraphs that

22   you are saying are wrong?

23             THE DEFENDANT:  That's it, your Honor.

24             THE COURT:  All right.

25             THE DEFENDANT:  That's it.

1          THE COURT:  Okay.  Thank you.  That's what I

2   needed to know.

3          THE DEFENDANT:  Yes, sir.

4          THE COURT:  And you can be seated, sir.

5          All right.  Reviewing the paragraphs in

6   question -- and where is the -- is the probation officer

7   there?

8          PROBATION OFFICER:  Yes, sir, your Honor.

9          THE COURT:  Okay.  And from where did you get

10  the information to include in those Paragraphs 24, 25,

11  and 26?

12         PROBATION OFFICER:  Your Honor, this was

13  information provided to me by the government in written

14  statements provided by Ms. Collins.

15         THE COURT:  Okay.  My guess is that

16  Paragraph 26 didn't come from Ms. Collins since that's

17  the DNA sample.  So, from where did that come?

18         PROBATION OFFICER:  Again, your Honor, it was

19  in information provided to me by the government.

20         THE COURT:  Okay.  In a report?  A memo?

21         (Video connection terminated.  Off the record,

22  5:02 p.m. to 5:08 p.m.)

23         (Open court, defendant present.)

24         THE COURT:  Okay.  There was an interruption

25  there in the video.  We're back on the record in the

1    *United States versus Patterson.*

2           Just to confirm once again, Mr. Noble, is the

3    audiovisual working at your end?

4           MR. NOBLE:  It is, your Honor.

5           THE COURT:  All right.  And I see that counsel

6    and Mr. Patterson are both there.

7           We've gone over the three paragraphs that

8    Mr. Patterson says are inaccurate; and I was asking the

9    probation officer on this.  Mr. Long, you'd gotten the

10   information about Ms. Collins, as I understand it, from

11   statements she made.  Looking at Paragraph 24, there is

12   also -- the paragraph ends, "A review of the bank's video

13   surveillance verified this individual as being Collins

14   and verified that a red 2001 BMW was registered to

15   Collins."  My guess is that was not in her statement

16   since she wouldn't have been doing that.  Where did that

17   come from?

18           PROBATION OFFICER:  That came from police

19   reports, your Honor.

20           THE COURT:  Okay.  And, so, somebody at the

21   police department had evidently -- after getting this

22   statement from Ms. Collins, went ahead and checked out

23   the surveillance to be sure that she actually showed up

24   being in this BMW and being at the bank?

25           PROBATION OFFICER:  Yes, your Honor.  As they

1  were involved in their investigation and they believed

2  that Ms. Collins was involved, they remembered seeing the

3  red BMW; so, they reviewed the video surveillance, found

4  the red BMW the day before, and were able to then go back

5  and review that to positively identify her.

6          THE COURT:  Okay.

7          PROBATION OFFICER:  And that's how they were

8  able to locate her.

9          THE COURT:  All right.  Now let's take a look

10  at Paragraph 25, the statement about she and a man showed

11  up at the police department to make a report about her

12  being kidnapped and they identified her and identified

13  the male friend as some guy named Darreyel Greer.  And

14  then there is a statement about an officer walked

15  outside, saw the vehicle, and then went ahead and

16  arrested both of them.  Where did that information come

17  from?

18          PROBATION OFFICER:  That came from a Big Sandy

19  Police Department police report.

20          THE COURT:  Okay.  So, these are police

21  officers -- or a police officer reporting what police

22  officers saw, i.e., Ms. Collins showed up with this guy

23  named Greer and then an officer going outside, seeing

24  that vehicle, the red BMW.  And, of course, that's what

25  had been verified on the surveillance tape that is

1  described in Paragraph 24, correct?

2            PROBATION OFFICER:  Yes, sir.

3            THE COURT:  All right.  And then Paragraph 26,

4  this paragraph about the DNA sample, where did that come

5  from?  Where did you get that information?

6            PROBATION OFFICER:  Your Honor, that came from

7  a document provided by the government.  I can't say

8  exactly if that was an FBI document or if it was a crime

9  lab document or what, but it was a written document

10 provided to me by the government.

11           THE COURT:  Okay.  And you don't happen to

12 have your file with you?

13           PROBATION OFFICER:  Yes, sir, I have my file.

14 My file as far as for the offense material, part of the

15 information is split between Ms. Collins' case and split

16 between Mr. Patterson's case.  So, her file contains

17 everything that happened in the Eastern District.

18 Mr. Patterson's case file right now has everything that

19 pertained to the Northern District case.

20           THE COURT:  Okay.  But, of course, we're in

21 the Eastern District today and both cases have been

22 transferred to my court and I'm trying to do a sentence

23 on both cases, right?

24           PROBATION OFFICER:  Yes, sir.

25           THE COURT:  Okay.  All right.  Then the

1  court -- first of all, the record will reflect that I've

2  read the entire Presentence Investigation Report and also

3  have read the Factual Resumé in this case, Document

4  Number 82, along with the Plea Agreement, Document

5  Number 78, and the information in there.

6         And as far as the -- for purposes of

7  sentencing -- and even though objections were to be filed

8  sometime back, Mr. Patterson has objected to

9  Paragraphs 24 and 25 based on what he says were

10 statements that Ms. Collins made that he saw in the

11 discovery.  But I'll note that Paragraphs 24 and 25 are

12 actually not based upon statements made by Ms. Collins.

13 Instead, they are based upon reports of what bank

14 employees saw and the police officers then reviewed the

15 tape -- that's in Paragraph 24 -- and then on

16 Paragraph 25 what police officers saw when this lady and

17 this Mr. Greer showed up and what the officers then did,

18 i.e., going out and checking out the car, again being the

19 red BMW, and then arresting Ms. Collins and Mr. Greer.

20        And, so, the court finds that there is

21 information with a sufficient indicia of reliability to

22 support its probable accuracy by a preponderance of the

23 evidence; and those objections, if they are objections,

24 to Paragraphs 24 and 25 are overruled.

25        As to Paragraph 26 about the DNA sample, don't

1  seem to be able to verify exactly where that came from;

2  so, I'll note for the record that I will not consider the

3  information in Paragraph 26 in imposing this particular

4  sentence.  On the other hand, I will note that based

5  upon -- oh, and by the way, I will also note that I find

6  that the other paragraphs under "The Offense" section,

7  i.e., starting off with Part A, Paragraph 1, on page 4

8  going through Paragraph 23 on page 8 -- I will note that

9  I have also reviewed those, compared those with the

10 Factual Resumé, and find that those paragraphs have a

11 sufficient indicia of reliability to support their

12 probable accuracy by a preponderance of the evidence; and

13 I will adopt those paragraphs in addition to

14 Paragraphs 24 and 25 for purposes of this sentencing

15 proceeding.

16        Based upon all of that information which I

17 have just referred to and that I've -- i.e., Paragraphs 1

18 through 25 of the report -- and based upon the

19 information in the Plea Agreement and the offenses to

20 which defendant pled and the information in the Factual

21 Resumé signed by defendant and which was entered at the

22 plea hearing, the court concludes that under the advisory

23 guidelines system the total offense level is 26 and the

24 criminal history category is 2.

25        Now, by statute -- I've reviewed the statutory

1  ranges here on the various counts that are set out there

2  and have taken those into consideration and then looked

3  at the guideline range on Docket Number 6:15cr40.  That

4  guideline range is 70 to 87 months.

5          And it looks like -- and correct me if I'm

6  misreading your report because it is a multiple report

7  that you've got there, Mr. Long.  But the way I'm reading

8  it there and the way I understood it as I went through

9  this is that the guideline range you have calculated

10  there is 70 to 87 months on Count 3 in the 6:15cr40 case

11  and then, on Count 4, 84 months in that case.  Is that

12  how you intended to write that?

13          PROBATION OFFICER:  Yes, your Honor.  The

14  Count 3 in Case Number 6:15cr40 and Count 1 in Case

15  Number 6:16cr41, those two -- the counts from each one of

16  those, Count 3 and Count 1, I arrived at 70 to 87 months

17  on those two counts.  Count 4 in case 6:15cr40 is

18  84 months.  Yes, your Honor.

19          THE COURT:  And that's required by statute,

20  7 years consecutive, which is the 84 months, correct?

21          PROBATION OFFICER:  Yes, sir.

22          THE COURT:  All right.  That's how I read it,

23  and I just wanted to confirm that because it is a little

24  more complex than some.

25          And then, likewise, on the supervised release

1  on Docket Number 6:15cr40, Count 3 would be 2 to 5 years;

2  on Count 5 (sic), 2 to 5 years; and then on 6:16cr41 on

3  Count 1, it would be 2 to 5 years.

4        And again, just to be sure because of the

5  number of -- you know, the two different counts which is

6  a little unusual, I'm understanding that correctly in

7  what you intended it to say.  Is that also correct,

8  Mr. Long?

9        PROBATION OFFICER:  Yes, your Honor.

10        THE COURT:  Okay.  And then the fine in this

11  particular case under the guidelines would be a fine of

12  12,500 to $125,000; and then the restitution would be a

13  total of $36,622; and then, finally, the special

14  assessment would be $300, $100 on each of the three

15  counts in the particular case.

16        I'll also note that I'm going to approve the

17  Plea Agreement and it is accepted, and I will notify the

18  defendant at this time that the Plea Agreement is

19  accepted and Judgment and sentence will be consistent

20  with it.

21        THE DEFENDANT:  Your Honor --

22        THE COURT:  So, I do not see in the file a

23  motion by either the government or defendant to go

24  outside of the guidelines, for example, by the government

25  to go above the guidelines and go as high as the statute

1  might possibly allow in the case.  I don't see any

2  motions to go outside the guideline by defendant.  So, I

3  will hear a statement from defendant's counsel, whichever

4  of you are going to -- well, first of all, let me ask:

5  Are there any objections to the ranges, as I've read them

6  out, from the government?

7              MR. NOBLE:  None from the government, your

8  Honor.

9              THE COURT:  Are there any objections to the

10 ranges, as I've read them out, from the defendant?

11             MR. LEVINE:  No, your Honor.

12             THE COURT:  All right.  Then at this time I

13 will hear a statement from one or the other of defense

14 counsel and then a statement from your client and then a

15 response from the government.

16             MR. LEVINE:  Thank you, your Honor.

17             Your Honor, if I may --

18             THE COURT:  Oh, let me ask one question.  I'm

19 sorry.  I forgot.

20             If I recall, I had a statement -- a victim

21 statement, and I know that she was there originally when

22 this whole case got delayed.  Are you still there, ma'am?

23             Is the victim still there?

24             MR. NOBLE:  She is, your Honor.

25             THE COURT:  Okay.  Then before counsel speak,

1    let's go ahead and hear from her; and that way counsel

2    will be able to address whatever she might have to say in

3    the case.  And there should be a microphone that is

4    available -- okay -- at the podium.

5              Ma'am, if you would please step forward and

6    first state your name.

7              AUDIENCE MEMBER:  Pamela Givens (phonetical).

8              THE COURT:  I'm sorry.  Could you --

9              MR. LEVINE:  Your Honor, may I briefly

10   interject?  I apologize.

11             THE COURT:  Okay.  Go ahead.

12             MR. LEVINE:  Thank you.

13             It was my understanding -- of course, I

14   understand that I may be wrong.  I believed that any

15   victim statement came after sentence was imposed, your

16   Honor, because it was for purposes of victim impact.  I

17   could be wrong, your Honor.  If I am, I apologize.

18             THE COURT:  Well, if it came after the

19   sentence was imposed, then there wouldn't be any impact;

20   and also you wouldn't have a chance to try to rebut it.

21   It would --

22             MR. LEVINE:  I thought it would be.  I'm

23   sorry.

24             THE COURT:  I would think that you would want

25   a chance to ameliorate anything the victim might say,

1  i.e., point out, well, this harm was done by someone else

2  and that harm really wasn't so much, I mean, whatever

3  kinds of things might possibly be available.  But more

4  importantly, if I pass sentence and then hear from the

5  victim, I can't change the sentence.

6           MR. LEVINE:  That's correct, your Honor.  You

7  could not change the sentence.

8           THE COURT:  Okay.

9           MR. LEVINE:  And my belief is that was the

10  point of it to come at the end, because it wasn't so much

11  the government's witness that they were calling but more

12  because she has the right to address the court and, of

13  course, Mr. Patterson.  I did not believe that at that

14  point I had a right to address her or to confront

15  anything she said precisely because it was at the end of

16  it.

17           THE COURT:  Okay.

18           MR. LEVINE:  But if I'm wrong, your Honor,

19  then I --

20           THE COURT:  Well, I'll overrule that as an

21  objection.  I'm not going to allow you to cross-examine

22  her; but if you hear something that you think for some

23  reason I shouldn't consider, you obviously have the

24  opportunity to say that.

25           MR. LEVINE:  Yes, your Honor.  Thank you.

1          THE COURT:  At this point, ma'am -- and I'm

2    very sorry for all of the delays.  But I hope you

3    understand that by continuing to move forward, we get

4    this done today rather than next week or the following

5    week or some other time.

6          I do appreciate your being here; and, so,

7    again, if you would state your name for the record and

8    then go ahead and tell me what you think I should know.

9          AUDIENCE MEMBER:  Pamela Givens (phonetical).

10         THE COURT:  Okay, ma'am.  Go ahead.

11         AUDIENCE MEMBER:  My name is Pamela Givens,

12   and I am a victim of carjacking.  My life was changed

13   this day, and it will never be the same.  I have never

14   had a problem with a stranger asking me a question.  This

15   is no longer true.

16         On Friday, March the 13th, 2015, I was asked a

17   simple question, "Where is Building 9?"  My answer led to

18   the defendant telling me, "Give me the keys" and a gun

19   being pulled out on me.  I have never been more in fear

20   of my life than that moment.

21         Other family members were affected this day.

22   My yelling and screaming traumatized my 70-year-old

23   mother who was trying to come out and see what was

24   happening because she knew it was my voice.  My military

25   spouse was three and a half hours away expecting a call

1    saying I was on my way home and, instead, received a call

2    stating that I had been robbed.

3              I was supposed to be picking up my

4    father-in-law from the airport, planning a retirement

5    party, and enjoying a happy occasion.  Instead, I was

6    canceling cards, filing police reports, and replacing

7    several items that were stolen.

8              I was victimized financially and emotionally.

9    My life or vehicle; I chose my life.  I still see the gun

10   being pulled and my life flash before me.  Some items had

11   more sentimental attachment than others.  I was more

12   upset over the fact that my deceased mother-in-law's

13   items were stolen instead of the financial loss.  Between

14   my laptop and wallet being stolen, I still have the

15   potential to be victimized further.  I had information

16   stolen from me and must constantly check to make sure

17   that my identity is not compromised.

18             I still have nightmares and trauma from the

19   ordeal.  I have anxiety when I am approached by

20   unfamiliar people.  This has affected my trust and

21   willingness to help and assist others.

22             My personal space was violated, my life was

23   threatened, and property was taken.  I was picked at

24   random early in the morning at my mother's residence.  I

25   am just glad it was me and not her.  I ask the court to

1  take my side into consideration when looking at

2  sentencing and rehabilitation.

3           I thank the court for allowing me to speak

4  today.  I had to pray to forgive what occurred, and I

5  have.  The healing process has just not been that simple.

6  Thank you for your time.

7           THE COURT:  All right.  Ma'am, again, I

8  appreciate your being here.  I mean, that's very

9  eloquent.  I know how difficult it is to be in court and

10 testify, especially federal court; and I know that -- I

11 apologize for the delay we had here today.  It's not

12 normally how the court is run.  But to have just, again,

13 canceled it and started over, it would have been another

14 week or so.  So, I appreciate your being here.  Thank

15 you, ma'am.

16          AUDIENCE MEMBER:  Thank you.

17          THE COURT:  All right.  Now I will hear a

18 statement from -- Mr. Levine, are you going to do it or

19 Mr. Nawaz?  Which are --

20          MR. LEVINE:  I will address the court, your

21 Honor, if I may.

22          THE COURT:  Go ahead.

23          MR. LEVINE:  Thank you, your Honor.

24          Your Honor, on Mr. Patterson's behalf, I'd

25 like to start off by apologizing and, of course,

1    apologizing for Omar and I showing up late.  And to

2    Ms. Givens, I apologize for everything, obviously.

3            Your Honor has a wide range in front of him,

4    but I respectfully submit that the government here has

5    taken into account all the most salient facts in reaching

6    this 11(c)(1)(B) with a recommended sentence of

7    154 months.  It not only reflects the guidelines, the

8    fact that at -- he will be 26 next month.  Mr. Patterson

9    has never been to prison.  He's never done anything more

10   than county jail time.

11           Without diminishing the severity of these

12   offenses, the fact remains -- and without minimizing the

13   trauma to Ms. Givens, the fact remains that no one was

14   hurt.  Was there the great potential for that?  Yes.  Of

15   course there always is.  But that is inherent in any

16   offense like this -- or, rather, every offense like this.

17           A sentence of 154 months, as contemplated by

18   the agreement with the government, is a very substantial

19   amount of time, your Honor.  It's an enormous, enormous

20   chunk of his young adult life; and I think that a very

21   different Laquaylan Patterson will walk out of there.

22           Look at his offenses; and they are contrary to

23   what you see from the rest of his life, your Honor.  You

24   didn't see him constantly getting kicked out of school,

25   going to TYC, going to TDC.  It is surprising in the

1  context of the rest of his history that these offenses

2  are attributed to him.

3        I'm going to ask the court to consider the

4  154 months.  I also believe that it serves a purpose of

5  finality in a difficult case like this.  And when I say

6  "finality," your Honor, I mean it affords the certainty

7  that the parties need to not proceed to trial on a case

8  like this; and I think there is something to be said for

9  that in consideration of the witnesses, the complainants,

10 the court's resources.  That is what got this case

11 essentially done, your Honor.  And I say that while

12 still, of course, recognizing your inherent authority and

13 discretion.  Do as you see fit.

14        I hope that you will find the 3553 factors,

15 though, also counsel in favor of accepting a -- or

16 imposing a 154-month sentence.  It is a long, long

17 sentence, your Honor.  It's not a slap on the wrist.

18 It's not an insult to anyone.  It's very substantial, and

19 I'm confident that it is going to result in a different

20 Laquaylan Patterson, an improved one.

21        For all those reasons I would ask that you

22 follow that, your Honor, and sentence him to 154 months

23 on both cases cumulative.  Thank you, your Honor.

24        THE COURT:  All right.  Mr. Patterson, is

25 there anything you would care to say?  If so, please

41

```
 1  stand up.
 2              THE DEFENDANT:  Yes, sir.  I was arrested due
 3  to the fact that I got indicted based on what Mr. Noble
 4  presented before a grand jury.  Like I say, the DNA
 5  didn't even come into effect until after I was arrested.
 6              THE COURT:  Okay.  And I have said --
 7              THE DEFENDANT:  They didn't have --
 8              THE COURT:  Sir, I have said that I am not
 9  considering -- I thought I said this -- or at least I
10  thought you would understand it.  That paragraph on the
11  DNA, I sustained your objection to it to the extent that
12  I did not consider that.  I am not considering the DNA as
13  part of this sentencing.  Okay?
14              THE DEFENDANT:  All right.
15              THE COURT:  I sustained the objection on that.
16              THE DEFENDANT:  Okay.  Well, here's what he
17  presented to a grand jury, right?  It say (reading) on
18  04082015 under the conditions of a mutual agreement and
19  after being identified as a co-conspirator, Chanel
20  Collins, black female, date of birth //////////, confessed
21  to participate in a carjacking and bank robbery with
22  Laquaylan Wesley Patterson, black male, date of birth
23  ////////// --
24              THE REPORTER:  Okay.  Stop for a minute,
25  please.
```

42

1          (Off-the-record discussion between the court

2     and court reporter.)

3          THE COURT:  Sir, hold up one minute, please.

4          I'm going to direct that the identifying

5     information, the dates of birth, be redacted from the

6     transcript.

7          And I would ask, sir, that if you are reading

8     from a document, please do not read out into the record

9     dates of birth or Social Security numbers or driver's

10    license numbers or home addresses because once that gets

11    out on the Net, then all of that is out there.  Okay?

12    I'm not stopping you --

13         THE DEFENDANT:  Yes, sir.

14         THE COURT:  -- from reading the other

15    information, just not those --

16         THE DEFENDANT:  Yes, sir.

17         THE COURT:  -- identifying numbers.  Okay?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  All right.  And if you would, slow

20    down just a tad.  You probably can't see her, but to my

21    left is the court reporter.  She is trying to take this

22    all down.  My left, not yours.

23         THE DEFENDANT:  Oh.

24         THE COURT:  Maybe you can see her.  I don't

25    know.  I doubt it.  But she needs --

1          THE DEFENDANT:  Do you want me to start over,

2    sir?

3          THE COURT:  -- to hear you.

4          No.  She's got what you've got so far; but

5    just remember not to start reading real, real fast

6    because it makes it hard for her.  Okay?

7          THE DEFENDANT:  Yes, sir.

8          THE COURT:  All right.  Go ahead.

9          THE DEFENDANT:  It says (reading) Collins

10   advised that during the bank robbery, Patterson contacted

11   Collins utilizing telephone number (469)626-9874 so that

12   Collins could hear what was going on inside the bank.

13   All right.  So, 0414 pursuant to grand jury subpoena,

14   AT&T provided call -- cell phone records for this.

15          Basically what I'm saying is the only thing

16   they had against me is her saying my name.  Other than

17   that, they had no evidence of me saying or doing

18   anything.  And I can prove -- I got her debrief here

19   where we can point out several lies that she made,

20   basically off the cell phone records that's not equal to

21   the AT&T records that was received.  It's not adding up,

22   sir.

23          I mean, that's what they provided in order to

24   get the Indictment against me.  I mean, that's all they

25   had.  I mean, other than that, they had no other reason

1   to say that, yeah, Laquaylan Patterson committed a bank

2   robbery or even robbed this lady of her car.  They have

3   no fact.  Nobody saying that but her.

4           But from the beginning we can show that she

5   called down here saying she was kidnapped.  We have proof

6   that she said -- let me see.  I got her debrief right

7   here.

8           THE COURT:  All right.

9           THE DEFENDANT:  She wrote a statement saying

10  she was kidnapped.  Not only that, she say (reading)

11  Collins had driven back to the Dallas area; so, she asked

12  her ex-boyfriend, Laquaylan Patterson, black male, date

13  of birth -- such-and-such, such-and-such -- to travel

14  back with her, positively identifying me as -- they

15  showed her -- they say a driver's license photo was

16  presented.

17          Okay.  They say (reading) on Monday Collins

18  picked up Patterson in Lancaster, Texas, on her way back

19  to JCC, location where she picked up Patterson, stated

20  that Patterson had --

21          THE REPORTER:  I'm sorry.  You're going to

22  have to slow down.

23          THE COURT:  Okay.  Slow down a little bit.

24          THE DEFENDANT:  Yes, sir.

25          THE COURT:  People can read -- when you're

1  reading stuff, you start going a lot faster than you

2  talk; and it's too hard for the court reporter.  Okay?

3            THE DEFENDANT:  All right.  Yes, sir.

4            It states (reading) on Monday Collins picked

5  up Patterson in Lancaster, Texas, on her way back to JCC.

6  Collins could not recall or identify the location at

7  which she picked up Patterson, and she stated that

8  Patterson had verbally instructed her over the telephone

9  how to arrive at his location.  After departing

10 Lancaster, both Collins and Patterson drove directly to

11 JCC and arrived on campus at approximately 9:30 a.m.

12           Also it says here (reading) on Wednesday

13 Collins and Patterson and Tamera Timmons (phonetical),

14 black female, date of birth, traveled to Timmons'

15 apartment in Tyler, Texas, to assist Timmons with some

16 car trouble that she had been having and later returned

17 to JCC for the remainder of the night.

18           THE COURT:  Okay.

19           THE DEFENDANT:  Okay.  Here I have reports

20 where it say she said she dropped her boyfriend Greer off

21 that Monday.  But here the reports of the boyfriend and

22 girlfriend once he arrived at -- they said she (reading)

23 states that her sister could tell us about Patterson.  It

24 says what she say.  (Reading) she states that on

25 Wednesday, March 11th, at about 5:00 a.m., Greer came to

1  her apartment in Euless.  Not on Monday, what she said in

2  her debrief, but she say he came on Wednesday.

3          Not only that, the boyfriend also said it,

4  too.  He arrived 5:00 p.m. -- 5:00 a.m. Wednesday

5  morning, not Monday when Greer said she was saying.

6          Not only that, you got her mama and her daddy

7  both placing her in Dallas, Texas.

8          They say Collins -- (reading) on Wednesday

9  Craig (indiscernible) spoke to her father.  Craig

10 (indiscernible) spoke to Antoine Collins.  Stopped by

11 Craig's residence last afternoon or early evening and

12 dropped off her daughter, Sidney.  Craig recalled Collins

13 being alone when she dropped off her daughter.

14         Not only that, her mama said she saw her also

15 that Wednesday evening by herself.

16         So, where was I at?  Where was I?  I mean,

17 they still have no proof of showing that I was with her

18 on the week of, except for at that gas station.  You

19 can't put me on campus.

20         Not only that, I mean, the cell phone records.

21 She say she didn't see the actual carjacking but -- here.

22 (Reading) Collins did not observe the actual carjacking,

23 nor was Collins aware Patterson had brandished a firearm

24 by stealing a vehicle.  Patterson called Collins via cell

25 phone as she was departing the scene and informed Collins

47

1  to exit the apartment complex at the time.

2          Here -- this is what they presented to me

3  saying this is what I guess was provided.  Here it says

4  the phone call was made at 8:17.  Phone call made at

5  8:17.  But if you come over here and look at the actual

6  cell phone records from her, you see the AT&T that were

7  provided.  Ms. Collins is already at the apartments at

8  8:17:01 seconds.  She's already at the apartment before

9  this phone call was even made.  So, I mean, you know,

10 that's another lie that she -- so, that prove there that,

11 hey, she either seen this -- she seen this or she's

12 lying, one of the two.

13         Not only that, they also say that -- they say

14 (reading) a phone call was made during the bank robbery

15 for 4 seconds and -- 4 minutes and 46 seconds.  Okay.

16 Well, this right here showed that four phone calls was

17 made in one minute.  Four phone calls was made in

18 1 minute.  I just find it difficult that four phone calls

19 was made in 1 minute without breaking the duration of a

20 cell phone for 4 minutes and 46 seconds.  There is no

21 way.

22         Not only that, you look at Collins' records,

23 you don't see that.  You don't see that phone call on

24 there, your Honor.  It's not in her cell phone records.

25 I'm not seeing it, your Honor.  I'm not seeing that

1    phone -- neither phone call.  I'm not seeing in the cell

2    phone records that what they -- the District Attorney

3    provided for a grand jury to even get a Indictment

4    against me.

5         Like I said, due to the fact she had -- they

6    had no other reason to say I did anything other than

7    Ms. Collins saying this and that, this and that.

8         But basically I just showed you several lies

9    that she made in her debrief.  So, what case do they have

10   against me?  What case do they have against me?

11        Not only that, I know you say you're not

12   bringing up the DNA or whatever; but I think you should

13   know, okay, two samples were collected from me.  The

14   first sample they said was lost in the mail room, and

15   I've got a e-mail of him saying it himself.  The first

16   sample was lost in the mail room, and basically they

17   located it.  Right?  So, my thing is where is this swab?

18   Where are these swabs at now?  Where are they at?  Ain't

19   nobody can tell me where these swabs are at.

20        A second swab was given in January.  Not only

21   that, the same guy who supposedly had lost the first DNA

22   swabs, he come back and tried to get the swabs by

23   himself, the same guy who lost them.  My point and what

24   I'm trying to say is I feel like he planted evidence due

25   to the fact he came back to the same locations.

49

1    Other than her statements and the DNA, you got

2    nobody to place me or say that, yes, I was with her or,

3    yes, I did this.  You've got no proof, no facts of

4    nothing.  I mean, I'm just not -- I just want to

5    understand it.  I'm not getting it.  I mean --

6    THE COURT:  All right.

7    THE DEFENDANT:  To me, I feel like the D.A.

8    lied before a grand jury to even get a Indictment due to

9    the fact they present a liar throughout her debrief; and

10    if we read the cell phone records, that's not even

11    appearing.  I mean, I'm just not getting it, your Honor.

12    THE COURT:  All right.

13    THE DEFENDANT:  Not only that, they had a

14    whole 'nother person arrested for the case.  They had

15    more than enough evidence saying, yes, it was him.  Then

16    all of a sudden she give her debrief; and now all the

17    evidence they had against him, well, it's now on me.

18    And like I said -- I mean, like I said, she

19    been lying from the beginning to the end.  Neither did

20    the -- I keep saying the DNA because I feel like that's a

21    big part of it and not mentioned in the CSI reports.

22    And not only that, I'm just trying to see how

23    did the FBI connect this when this CSI agent is not

24    saying not one time anything about a window or a window

25    switch.  How did this appear?  I mean, I'm not getting

50

1  it.  I'm not getting it.

2           THE COURT:  All right.

3           THE DEFENDANT:  I'm not seeing -- I'm not

4  seeing any facts.  I mean, justice needs to be served.

5  I'm not seeing any facts against me proving to, okay,

6  yeah.

7           Like I say, you can't place me with this

8  female.  Not only that, your victim, she wasn't even able

9  to give a full description of the suspect on the day of.

10 Neither was I ever put in a lineup of anybody positively

11 identifying me as being a suspect of anything or seeing

12 me in Tyler, Texas, on the day of the bank robbery.

13          The statement she gave -- I mean, I don't see

14 that being no more than five minutes.  She didn't say,

15 well, two years later she remember what the suspect look

16 like or anything of that nature.  How would she know that

17 I was the suspect if she weren't able to say she knew who

18 I am, she knew my name, or I was even put in their lineup

19 to say that, yeah, I was a suspect.

20          And like I said, they had a whole 'nother

21 person arrested for the case; and then all of a sudden,

22 I'm the suspect due to the fact that she gave her debrief

23 which was full of lies as you've seen.

24          I'm just not seeing no case.  I mean, I feel

25 like -- how I feel, I'm like if we would take it to

1  trial, I'm looking at a mistrial fixing to happen.  I

2  mean, they still haven't shown me not one piece of

3  evidence that say, yes, you're guilty or explain this

4  or -- you know what I'm saying?

5          Like I say, they don't have no written

6  statement, no confession of me saying it or anybody

7  giving any detail of anything of any nature.  So, all --

8  they whole case is based off what Ms. Chanel Collins

9  said; but basically, I feel she discredited because she's

10 been lying from the beginning to the end of the whole

11 investigation.

12          THE COURT:  All right.

13          THE DEFENDANT:  And basically that's what

14 he -- what they presented.  He presented the cell phone

15 records that's not adding up --

16          THE COURT:  All right.

17          THE DEFENDANT:  -- and this debrief --

18          THE COURT:  Okay.  You've --

19          THE DEFENDANT:  -- before a grand jury that

20 got me indicted.

21          THE COURT:  All right.  And you've gone over

22 that a couple of times.  I think I understand your

23 position.  Is there anything else?

24          THE DEFENDANT:  I mean, like I said, I've been

25 trying to get my lawyer to set up this meeting with this

1  guy for forever.  I mean --

2           THE COURT:  Sir, keep in mind the

3  U.S. Attorney or Assistant U.S. Attorney doesn't have to

4  meet with anybody if he doesn't want to.

5           THE DEFENDANT:  No.  He agreed to --

6           THE COURT:  A defense attorney can ask and --

7           THE DEFENDANT:  He --

8           THE COURT:  -- the prosecuting attorney

9  doesn't have to and he can say "yes" one day and he can

10  say "no" the next day.  That's up to him.  Okay?

11          THE DEFENDANT:  He can.

12          THE COURT:  It's not --

13          THE DEFENDANT:  He can.  He can.

14          THE COURT:  It doesn't affect your sentencing.

15  So, do you have some other point?

16          THE DEFENDANT:  I mean, I feel like it was a

17  lack of communication throughout the whole thing.

18          THE COURT:  All right.

19          THE DEFENDANT:  I haven't seen or heard from

20  my lawyer since September 8th.

21          THE COURT:  Okay.

22          THE DEFENDANT:  I mean, I didn't even know I

23  had court today.

24          THE COURT:  Okay.  At this point we're going,

25  you know, into the sentencing.  Is there anything else

1 about the sentencing?

2          THE DEFENDANT:  I mean, I'm not seeing

3 anything for me even to be sentenced, your Honor.  I'm

4 not seeing any evidence that's in relation.

5          THE COURT:  Okay.  Thank you.

6          Any response from the government?

7          MR. NOBLE:  Thank you, your Honor.

8          I think Mr. Levine made reference to

9 communications we had during plea negotiations that the

10 government would be willing to recommend the low end of

11 the guidelines.  And in making that agreement, I think

12 the government reasonably anticipated that the defendant

13 would accept responsibility and would continue to accept

14 responsibility through the sentencing hearing; and all

15 the government has heard through the large balance of

16 this hearing is the defendant in large part arguably

17 revoking his acceptance of responsibility.

18          We also observed his lack of respect for

19 Ms. Givens as she addressed the court and gave her victim

20 impact statement; and it made me think that we would be,

21 likewise, likely to see the same type of disrespect if we

22 were to hear from all the tellers that had a gun pointed

23 in their face at Cornerstone Credit Union and/or the

24 tellers that had guns in their faces at the First

25 National Bank in Big Sandy.  I know the court is aware of

1  that.

2          And the court has indicated its willingness to

3  accept our (c)(1)(B) agreement, which, of course, is a

4  nonbinding agreement; but we have entered good-faith

5  negotiations and stipulations about the guideline

6  applications.  Having said that, judge, we just defer the

7  sentencing in this case to your discretion.

8          THE COURT:  Let me just be very clear for the

9  record because I've heard both of you now refer to an

10  agreement as to a recommendation at the low end of the

11  guideline range.  I'm not -- and both of you were very

12  careful not to mention it was an 11(c)(1)(C), but let me

13  just confirm that.  There is no 11(c)(1)(C) agreement or

14  binding agreement here for a recommendation at the low

15  end of the range, is that correct, Mr. Levine?

16          MR. LEVINE:  Yes, your Honor.  I believe

17  the -- yes.  Correct, your Honor.  It is nonbinding.

18  Yes, sir.

19          THE COURT:  That's what I heard you say.

20          And the same for Mr. Noble; is that correct?

21          MR. NOBLE:  You're right, judge.  There is not

22  a (c)(1)(C) binding Plea Agreement in this case.

23          THE COURT:  All right.  And while there may

24  have been discussion in the Plea Agreement, I am not

25  seeing -- maybe I missed it.  I tried to go through this

1    very carefully -- as in the agreement itself that there

2    would be a particular recommendation one way or the

3    other.  Did I miss that paragraph in one of these two

4    Plea Agreements?

5                MR. NOBLE:  You did not, your Honor.  That was

6    in -- that was not a part of our written Plea Agreement

7    in either case.

8                THE COURT:  Okay.

9                MR. NOBLE:  There was a conversation -- okay.

10               THE COURT:  That's all I want.  Okay.  Then I

11   understood it properly.  I just wanted to be sure.

12               MR. NOBLE:  Yes, sir.

13               THE COURT:  And also for the record, let me be

14   sure because when I went through before the information

15   the court was relying on, I was focusing on the lower

16   numbered case, the 6:15cr40.  But, of course, I had also

17   and took into consideration the 6:16cr41 case which is

18   part of this today and had, again, the information in the

19   Plea Agreement in that case, Document Number 6, and the

20   offense to which defendant pled and also the Factual

21   Resumé in that case also signed.  So, it is not -- when I

22   was going through it before, I want to be very sure for

23   the record it wasn't just the one.  I had both along with

24   that other information.

25               Does the government know of any reason why

1    sentence should not be imposed at this time?

2              MR. NOBLE:  No, sir, your Honor.

3              THE COURT:  Does the defendant know of any

4    reason why sentence should not be imposed at this time?

5              MR. LEVINE:  No, your Honor.

6              THE COURT:  All right.  Mr. Patterson, will

7    you please stand?

8              Sir, you are before this court having pled

9    guilty to and been found guilty of, in the 6:15cr40 case,

10   Count 3, bank robbery and aiding and abetting and, Count

11   4, use and carrying of a firearm during a crime of

12   violence and aiding and abetting and, in the 6:16cr41

13   case, Count 1, bank robbery.

14             Now, Congress sets out the factors I have to

15   consider in this case in 18 USC, Section 3553.  I

16   normally take those factors in reverse order, and

17   Factor 7 is restitution.  In this particular case that

18   is, in fact, going to be part of the Judgment, the

19   restitution of $36,622.

20             Then I take a look at what is provided by

21   statute, which is set out in the Presentence

22   Investigation Report; and I compare that with the

23   guideline range, which is set out in the guidelines

24   approved by the Sentencing Commission and allowed to go

25   forward by Congress.

1              And I have to consider first do I go outside
2  of the guidelines.  Well, neither side has made a motion
3  to go outside of the guidelines; and in this particular
4  case, the court doesn't see a reason to go outside of the
5  guidelines.  That goes a long way to taking care of
6  Factor 6, which is avoiding unwarranted disparities of
7  sentence, meaning people with a similar criminal history
8  and similar offenses should get a sentence that is pretty
9  close to the same.  That's what the guidelines are
10 intended to do, and I've compared this with other similar
11 cases to make sure that is accomplished here.

12              So, then I have to decide where in the
13 guideline range the sentence should be.  Now, of course,
14 the sentence dealing with the firearm is 84 months
15 consecutive to the other counts.  That is by statute.
16 That's on Count 4 in the 6:15cr40 case; and, so, there is
17 not a range there.

18              In the other case there is the range -- or the
19 other count -- or actually on both counts.  The range is
20 between 70 and 87 months.  Now, to decide where in the
21 range it should be, the court looks at the history and
22 characteristics of defendant and the nature and
23 circumstances of the offense.

24              Taking a look at the history and
25 characteristics of the defendant, you are at a

1  Category 2.  You had three points on your criminal

2  history.  There is some mention in there of convictions

3  which were too old to count in the particular case or

4  were juvenile; and, so, they didn't count.

5          And the three points that you received, one is

6  on a theft of property from 500 to 1,500.  One is on some

7  marijuana.  There is the one point there.  Those three

8  points for your criminal history category at that point

9  could support the argument made by your attorney for a

10 sentence at the lower end of the range.

11         But I also have to consider the nature and

12 circumstances of these particular offenses, and the court

13 has to say that the use of the firearm -- and keep in

14 mind while you -- I'll note that you pointed out much of

15 the information in the Indictment you say is not

16 supported; but an Indictment is probable cause.  In other

17 words, the grand jury is just simply trying to decide is

18 there enough information to have a case go forward.  They

19 don't find proof beyond a reasonable doubt.  It's is

20 there sufficient information here to bring the charges

21 and let the government go forward.

22         I'm relying on the information that, as I've

23 mentioned, is in the Presentence Investigation Report.

24 I'm not relying upon that DNA as you mentioned you

25 pointed out.  And the probation officer didn't have the

1  documents to support that.  Fine.  But all of the other

2  information, I've made my ruling on.

3          And I'm also looking at, of course, the two

4  Plea Agreements which you signed and the two Factual

5  Resumés which you signed.  And based on all of that,

6  we're talking about some cases where -- Mr. Levine

7  pointed out nobody got hurt.  Nobody got shot perhaps.

8  Of course, the case would be a lot more serious if that

9  had happened.

10          But I have to look at, and Congress tells me

11  to look at, the consideration of deterrence -- and it is

12  important to deter people from using firearms in crimes

13  like bank robbery or carjacking or even just scaring

14  people -- and protection of the public.  And based upon

15  those, I find that those support a sentence at the higher

16  end of the guideline range.

17          And, so, therefore, the court finds that the

18  following sentence is going to meet the congressional

19  objectives of deterrence, specific deterrences to you and

20  general deterrences to others; protection of the public;

21  and promotion of respect for the law.  And, therefore,

22  pursuant to the Sentencing Reform Act of 1984, it is the

23  Judgment of the court --

24          THE DEFENDANT:  May I make a input, your

25  Honor?

1          THE COURT:  Sir, at this point I'm going

2    forward on the sentence.  Okay?

3          THE DEFENDANT:  All right.  Yes, sir.

4          THE COURT:  Pursuant to the Sentencing Reform

5    Act of 1984, it is the Judgment of the court that the

6    Defendant Laquaylan Wesley Patterson is hereby committed

7    to the custody of the Bureau of Prisons to be imprisoned

8    for a total term of 171 months.  This is 87 months on

9    Count 3 in Docket Number 6:15cr40 and Count 1 in Docket

10   Number 6:16cr41.  In other words, those two counts --

11          Let me just be sure, Mr. Long, because the way

12   you have it written, it sounds like the two 87s are

13   consecutive.  Those two are concurrent, right?

14          PROBATION OFFICER:  Yes, your Honor.

15          THE COURT:  Yeah.  Those two counts, the

16   87 months -- there is 87 months on each count, but that

17   is concurrent.

18          And then a term of 84 months on Count 4 in

19   Docket Number 6:15cr40 which, of course, by statute must

20   be consecutive.

21          And, so, it is 87 months on those first two

22   counts -- that is concurrent, though; they run at the

23   same time -- and then the 84 months on Count 4 in Docket

24   Number 6:15cr40, that is consecutive as required, for a

25   total of 171.

1          It is further ordered that defendant is

2     jointly and severally liable with Chanel Collins in

3     Case 6:15cr40 to pay restitution totaling $29,734 to the

4     victim listed in the "Restitution" section of the

5     presentence report, which is due and payable immediately;

6     and it is further ordered defendant is to pay restitution

7     in Docket Number 6:16cr41 totaling $6,888 to the victim

8     listed in the "Restitution" section of the presentence

9     report, which is due and payable immediately.

10          The court finds the defendant does not have

11     the ability to pay a fine.  The court will waive the fine

12     in this case.

13          The court finds the defendant does not have

14     the ability to pay interest.  The court will waive the

15     interest in this case.

16          It is ordered the defendant shall pay the

17     United States a special assessment of $300, being $100 on

18     each of the three counts.  That is due and payable

19     immediately.

20          Upon release from imprisonment, defendant

21     shall be on supervised release for a term of 5 years.

22     This consists of terms of 5 years on each of Counts 3 and

23     4 in Docket Number 6:15cr40 and 5 years on Count 1 in

24     Docket Number 6:16cr41, all of those terms to run

25     concurrently.

1              Within 72 hours of release from the custody of

2    the Bureau of Prisons, defendant shall report in person

3    to the probation office in the district to which

4    defendant is released.  While on supervised release,

5    defendant shall not commit another federal, state, or

6    local crime; shall comply with the standard conditions

7    that have been adopted by the court; and must comply with

8    the mandatory and special conditions and instructions

9    that have been set forth in the defendant's presentence

10   report.

11             Now, just for clarity, those are the special

12   conditions set out at page 23 of this Document 15, the

13   PSI.  It is titled "Supervision Conditions

14   Recommendation."  It is no longer a recommendation.  It

15   is what I've adopted -- and it also goes into page 16 --

16   I'm sorry -- page 24 of Document 15; and, so, that's the

17   conditions and -- mandatory conditions and special

18   conditions and special instructions that must be followed

19   on supervised release.

20             I will recommend that the defendant receive

21   appropriate drug treatment while imprisoned, and it is

22   also recommended that defendant participate in the Inmate

23   Financial Responsibility Program at a rate determined by

24   the Bureau of Prisons staff in accordance with the

25   requirements of the Inmate Financial Responsibility

1   Program.

2           And you may be seated, sir.

3           THE DEFENDANT:  Can I say something else?

4           THE COURT:  I'll let you speak in a minute.

5   Let me go ahead and finish the rest of this so you -- I

6   need to get through this.  There are some things that I'm

7   required to inform you of.

8           A defendant can appeal a sentence and/or a

9   conviction if a defendant believes that his plea of

10  guilty was involuntary or unlawful or there is some

11  fundamental defect in the proceedings that was not given

12  up by his Plea Agreement.  In this case you've entered

13  into two Plea Agreements; and in those Plea Agreements,

14  you have waived, or given up, many of your rights to

15  appeal.

16          That is usually enforceable.  If you believe

17  for some reason some point was not given up, in other

18  words, was not waived or it is not enforceable, you may

19  present that theory to a Court of Appeals.  What you need

20  to know is if you are thinking of filing some kind of an

21  appeal, in almost every case you would need to give

22  notice within 14 days of me signing the Judgment.  Do you

23  understand that, sir?

24          THE DEFENDANT:  Excuse me now.  Wait.  Am I

25  able to do a appeal?  You know what I'm saying?  Am I

1 able?

2          THE COURT:  Well, what I'm telling you, what

3 I'm notifying you -- and I'm also going to direct your

4 attorneys to explain it to you again if necessary.  If

5 you're thinking of filing some kind of an appeal of

6 either the conviction in either of these cases or my

7 sentence, in almost every case -- in other words, under

8 most circumstances if you're thinking of doing that, it

9 is required that you file a notice of appeal within

10 14 days of me signing the Judgment.  Do you understand

11 that time limit?

12          THE DEFENDANT:  Yes, sir.  14 days.

13          THE COURT:  14 days.

14          THE DEFENDANT:  Is that 14 business days?

15          THE COURT:  No, 14 days.

16          THE DEFENDANT:  Okay.

17          THE COURT:  14 days.  That's why I'm telling

18 you because if something comes in in two or three months,

19 probably it's going to get rejected.  So, if you're

20 thinking of filing appeal, you've got 14 days after I

21 sign it.  I probably won't sign it --

22          THE DEFENDANT:  How can I go --

23          THE COURT:  Wait, wait.

24          THE DEFENDANT:  All right.

25          THE COURT:  I probably won't sign it today

1  because it is too late to get it done.  It probably won't

2  be until tomorrow or the next day.  But once I sign it,

3  it is 14 days.  Do you understand that, sir?

4              THE DEFENDANT:  Yes, sir.

5              How can I go about doing that?

6              THE COURT:  Wait.  Let me -- do you first

7  understand you've got this deadline?  Do you understand

8  that?

9              THE DEFENDANT:  Yes, sir.  Yes, sir.

10             THE COURT:  Okay.  The next thing is if you

11  are not able to pay the cost of an appeal, you may

12  request to -- or may ask to file an appeal without paying

13  costs.  If you make that request, I will direct that the

14  Clerk of the Court to file that request so it can be

15  dealt with.  Do you understand that, sir?

16             THE DEFENDANT:  Yes, sir.

17             THE COURT:  In other words, you can ask to

18  file -- in other words, you can ask to appeal without

19  paying costs.

20             And I would ask counsel to make very sure he

21  understands that; and if a notice needs to be given,

22  let's go ahead and get it done.  Don't want that coming

23  up later.

24             All right.  Let me also ask, counsel, do you

25  want or does you're client want a recommendation as to a

1   place of confinement?

2           THE DEFENDANT:  Yes.

3           MR. LEVINE:  Your Honor, he would ask for as

4   close to Dallas as practicable, perhaps Seagoville or FMC

5   Fort Worth.

6           THE COURT:  Is that to make it easier for his

7   family to visit him?

8           MR. LEVINE:  Yes, your Honor.

9           THE COURT:  Is that to make it easier for his

10  family to visit him?

11          MR. LEVINE:  Yes.

12          THE COURT:  Okay.  To make it easier for his

13  family to visit him, I will recommend that defendant be

14  placed as close as possible to Dallas.

15          I'll write that recommendation in your

16  Judgment, sir; and I'll give the reason for it, so your

17  family can visit.  You need to understand that the Bureau

18  of Prisons does not always take my recommendation.  For

19  example, Fort Worth is generally used for people with

20  severe medical conditions; so, probably they are not

21  going to do Fort Worth.  It is possible that Seagoville

22  is overcrowded, and they may send you somewhere else.

23  But that is up to them.  If you want me to recommend a

24  different place, I can do it; but you've got to

25  understand no matter what I recommend, they don't always

```
 1   take my recommendation.  Do you understand that, sir?

 2              THE DEFENDANT:  Yes, sir.

 3              THE COURT:  I'm sorry?

 4              THE DEFENDANT:  I would like to -- yes, sir, I

 5   understand.

 6              THE COURT:  Let's go through one thing at a

 7   time.

 8              THE DEFENDANT:  Okay.

 9              THE COURT:  You may think I'm slow, but that's

10   just me.  I'm slow.  We'll do it one thing at a time.

11              All right.  Now, is there anything else from

12   point of view of the government?

13              MR. NOBLE:  Judge, I don't know, for the

14   record, if we have filed a Motion for Final Order of

15   Forfeiture with regards to the sum of cash stolen from

16   the First National Bank in Big Sandy.  The motion for

17   forfeiture does not include the sum from the bank in

18   Lancaster, just as things evolved.  But we would ask the

19   court to grant that motion.

20              THE COURT:  All right.  Was that part of the

21   Plea Agreement?

22              MR. NOBLE:  It was, your Honor.

23              THE COURT:  Any objection?

24              MR. LEVINE:  No objection, your Honor.

25              THE COURT:  All right.  Then I will grant that
```

```
 1   motion, and I'll sign that order when it comes through on

 2   the electronic system.

 3              Anything else from the government?

 4              MR. NOBLE:  No, sir, your Honor.

 5              THE COURT:  No forfeiture of a weapon or

 6   anything like that?

 7              MR. NOBLE:  No, sir.

 8              THE COURT:  All right.  Typically remaining

 9   counts, there is a motion to dismiss those.

10              MR. NOBLE:  Yes, judge.  We have yet to

11   sentence the codefendant in the case, and I will file

12   that motion or make that oral motion at that time.

13              THE COURT:  Well, I don't see how the sentence

14   of the codefendant has to do with this defendant.

15              MR. NOBLE:  Well, she's charged in Counts 1

16   and 2, your Honor; so, I --

17              THE COURT:  Well, I can dismiss the counts as

18   to this defendant, right?

19              MR. NOBLE:  Oh.  Certainly, judge.  Then we

20   would move to that effect.

21              THE COURT:  Okay.  No objection to that, I

22   take it.

23              MR. LEVINE:  No objection, your Honor.

24              THE COURT:  All right.

25              MR. LEVINE:  Thank you.
```

```
 1              THE COURT:  All remaining counts that were not
 2   covered in this sentence -- all remaining counts as to
 3   this defendant are dismissed, not as to any other
 4   defendant.
 5              Okay.  Anything else from the government, just
 6   to be sure?
 7              MR. NOBLE:  No, sir, your Honor.
 8              THE COURT:  All right.
 9              MR. NOBLE:  Thank you.
10              THE COURT:  Now, anything else from -- first
11   of all, let me ask counsel -- defendant's counsel.  Is
12   there any other issue that I need to cover?
13              MR. LEVINE:  Not that I'm aware of, your
14   Honor.
15              THE COURT:  Okay.  Mr. Patterson, you had said
16   you wanted to say something.  Now here is your chance.
17   Please stand up.
18              THE DEFENDANT:  I'm just not seeing how I'm
19   looking at 171 months, the high end, with the lack of
20   admissible evidence.  I mean, I just -- I still haven't
21   seen -- they had said -- I got all the statements from
22   people from the bank, from the transfer of the court,
23   even from her; and no one seems to positively identify
24   the suspect.
25              THE COURT:  Okay.
```

1          THE DEFENDANT:  And like I said, I pointed out

2    to you where she lied several times throughout her

3    debrief.  At the beginning of the court of her giving her

4    debrief, they said if she lied at any point in time, that

5    it would be disclosed -- discluded.

6          THE COURT:  All right.

7          THE DEFENDANT:  I mean, I feel like she should

8    be discredited due to the fact she been lying from the

9    beginning to the end.  So, how can anybody say that what

10   she said is the truth to the fact?  I wasn't there, you

11   wasn't there, my lawyer wasn't there, and Mr. Noble

12   wasn't there.  Your whole investigation is based off what

13   she's saying, what she provided.

14         THE COURT:  Okay.

15         THE DEFENDANT:  And I don't --

16         THE COURT:  I think, sir, you've heard me say

17   it; and I'll say it one more time.  My sentence is based

18   on the information in the Presentence Investigation

19   Report which came from others.  I read through it and

20   pointed out where it came from police officers, where it

21   came from other people, surveillance tapes and so forth.

22   It also came from the two Plea Agreements you signed and

23   from the two Factual Resumés that you signed.  So, I

24   appreciate --

25         THE DEFENDANT:  I will --

1           THE COURT:  Wait.  Wait.  Let me finish, sir.

2           THE DEFENDANT:  Yes, sir.  Yes, sir.

3           THE COURT:  So, I appreciate your position.

4    That's why I gave you notice -- or told you about your

5    notice of right to appeal.

6           And, so, at this time the defendant is

7    remanded to the custody of the United States Marshal and

8    then to the custody of the Federal Bureau of Prisons to

9    begin sentence.

10           Just to avoid -- well, just to avoid problems

11    later on, counsel, are you going to give notice of

12    appeal?  I mean, there would be time -- I don't know if

13    you're involved in the appellate field or not but -- that

14    can be dealt with later.  But if there is going to be a

15    notice, I want it out of the way as absolutely soon as

16    possible.  If there is not going to be notice, that's

17    fine; but if there is going to be one, let's not be

18    having big arguments later on about timing or lawyers

19    were late or anything like that.  That just complicates

20    things.

21           MR. LEVINE:  I anticipate, your Honor, that he

22    wants to appeal.  In fact, he is expressing as we stand

23    here that it is his desire to appeal.  I will file that

24    tomorrow unless your Honor instructs me to file it today.

25    I certainly can do that when I get back to Dallas.

1          THE COURT:  It would be difficult to file it

2    today because -- but if your client wants it filed, then

3    let's get it filed tomorrow; and that avoids --

4          MR. LEVINE:  Yes, your Honor.

5          THE COURT:  -- all of the problems of

6    procedure and everything else that comes up.

7          MR. LEVINE:  Of course.

8          THE COURT:  And that way the -- you don't need

9    the complaints, and I don't need to deal with those

10   procedural problems by not having it filed on time.

11   Okay?

12         MR. LEVINE:  Yes, your Honor.

13         THE COURT:  All right.

14         MR. LEVINE:  Your Honor, if I may very

15   briefly.  I anticipate it is not a surprise to the court

16   that there is a degree of animus, I believe, for lack of

17   a better word, that has developed over the course of our

18   representation.  I believe that --

19         THE COURT:  And I think I mentioned just a few

20   seconds ago that once the notice is filed, it would be

21   easy then to file the appropriate motions.

22         MR. LEVINE:  Thank you.  Thank you, your

23   Honor.  I shall do that.  I appreciate it.  I know what

24   to file.  Thank you, judge.

25         THE COURT:  Okay.  All right.  In that case

1   counsel are excused.  Defendant has been remanded to

2   custody.

3           And, again, ma'am --

4           Mr. Noble, would you sit down or move to your

5   right or left just a second?  Yes.

6           Thank you very much for being here, ma'am.  I

7   appreciate it.  And I am gathering that may be your

8   husband or friend or somebody.  Thank you.  I know this

9   has been a long evening.

10          But at this time the defendant is remanded to

11  custody.  Everyone else is excused, and the court is

12  adjourned.

13          And thank you for the -- and anyone from the

14  Clerk's Office and the CSO's office who is there, thank

15  you also for accommodating us going late.  Thank you.

16          MR. NOBLE:  Thank you, your Honor.

17          (Proceedings concluded, 6:13 p.m.)

18  COURT REPORTER'S CERTIFICATION

19          I HEREBY CERTIFY THAT ON THIS DATE, JULY 18,

20  2018, THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE

21  RECORD OF PROCEEDINGS.

22                    /s/_____
                      CHRISTINA L. BICKHAM, RMR, CRR
23

24

25